# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

NANCY DOWD LUMAGHI, Individually
and as Personal Representative of the Estate
of PETER LUMAGHI, Deceased

Plaintiff,

v.

COVIDIEN LP,
COVIDIEN SALES LLC,
COVIDIEN HOLDING INC.,
and MEDTRONIC, INC.,

Defendants.

Case No. 4:21-cv-01311-MTS

## SECOND AMENDED COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff NANCY DOWD LUMAGHI, Individually and as Personal

Representative of the Estate of Peter Lumaghi, Deceased, by and through her undersigned counsel,

hereby files this Second Amended Complaint against Defendants COVIDIEN, LP, COVIDIEN

SALES LLC, COVIDIEN HOLDINGS, INC. and MEDTRONIC, INC., as follows:

## INTRODUCTION

1.      Defendants, and each of them, designed, manufactured, and marketed without

proper warnings, defective Circular and Linear staplers.

2.      Plaintiff's decedent, Peter Lumaghi, was injured when a surgical stapler, designed,

manufactured, and marketed by Defendants, malfunctioned during his July 25, 2018 laparoscopic

low anterior resection and flexible sigmoidoscopy, resulting in a leak in his colon that had to be

repaired through additional surgery, and that resulted in an Enterobacter sepsis, ultimately causing

or contributing to his death on October 3, 2018.

1

## JURISDICTION AND VENUE

3.     This case was removed to federal court on the basis of diversity jurisdiction.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), in that there is complete diversity between Defendants and Nancy Dowd Lumaghi, individually and as personal representative of the estate of Peter Lumaghi, deceased, and the amount in controversy exceeds $75,000.

4.     A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in this federal judicial district. Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district.

## PARTIES

5.     Plaintiff, Nancy Dowd Lumaghi, Individually and as Personal Representative of the Estate of Peter Lumaghi, Deceased, has been and continues to be a resident and citizen of St. Louis County, Missouri.

6.     Defendant Medtronic, Inc. is a Minnesota Corporation that has its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota. Medtronic is a medical device company involved in the manufacturing, marketing, packaging, labeling and sale of medical devices. At all times relevant to this action, Medtronic has conducted substantial business in Missouri and regularly caused its products to be sold in Missouri, including to Barnes Jewish West County Hospital in St. Louis, Missouri. Plaintiff's causes of action also arise out of specific conduct occurring in the County of St. Louis, State of Missouri. Therefore, personal jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

7.     Covidien LP is a Delaware Limited Partnership with its principal place of business in Massachusetts.  It is the single member of Covidien Sales LLC, a Delaware limited liability

company with its principal place of business in Massachusetts. Covidien LP has one general partner: Covidien Holding Inc., a Delaware corporation with its principal place of business in Massachusetts. Among their business activities, Covidien Sales LLC and Covidien LP are involved in the manufacture, distribution, sales, marketing, regulatory management, and services related to Covidien medical products in the United States, and in Missouri where they maintain a large sales operation selling Covidien medical products all over the State of Missouri, including the specific surgical stapler involved in the subject incident. At all times relevant to this action, Covidien Sales LLC and Covidien LP have conducted substantial business in Missouri. Plaintiff's causes of action arise out of a specific conduct committed in the County of St. Louis, State of Missouri. Therefore, personal jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

8. Covidien Sales LLC is a Delaware limited liability company with its principal place of business in Massachusetts. Covidien Sales LLC has a single member: Covidien LP, a Delaware Limited Partnership with its principal place of business in Massachusetts. Covidien LP, in turn, has one general partner: Covidien Holding Inc., a Delaware corporation with its principal place of business in Massachusetts. Among its business activities, Covidien Sales LLC is involved in the manufacture, distribution, sales, marketing, regulatory management, and services related to Covidien Sales LLC medical products in the United States, and in Missouri where it maintains a large sales operation selling Covidien Sales LLC products all over the State of Missouri, including the specific surgical stapler involved in the subject incident. At all times relevant to this action, Covidien Sales LLC has conducted substantial business in Missouri. Plaintiff's causes of action arise out of a specific conduct committed in the County of St. Louis, State of Missouri. Therefore, personal jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth

3

Amendments to the Constitution of the United States of America.

9.    Covidien Sales LLC is registered to do business in the State of Missouri and, thus, has consented to jurisdiction in the state. Furthermore, Covidien Sales LLC is a wholly owned subsidiary of Medtronic, Inc., a Minnesota Corporation, and has systematic and continuous connections with the State of Missouri operating as a subsidiary under the complete control of Medtronic, Inc. At all times relevant, Defendant Covidien Sales LLC sold, marketed, and distributed its products, including surgical staplers, throughout the United States, including the State of Missouri.

10.    Defendant Covidien Holding Inc. is a Delaware Corporation with its principal place of business in Massachusetts. Defendant Covidien Holding Inc. is registered to do business in the State of Missouri. Furthermore, Covidien Sales LLC is a wholly owned subsidiary of Medtronic, Inc., a Minnesota Corporation, and has systematic and continuous connections with the State of Missouri operating as a subsidiary under the complete control of Medtronic, Inc.

11.    At all times relevant, Defendant Covidien Holding Inc. sold, marketed, and distributed its products, including surgical staplers, throughout the United States, including the State of Missouri.

12.    In January 2015, Medtronic wholly acquired Covidien. From that point forward, Medtronic has been responsible for the actions of Covidien, and exercised control over Covidien's functions specific to the oversight of compliance with applicable safety standards relating to and including the Covidien Products sold in the United States. In that capacity, Medtronic committed tortious and wrongful acts or allowed those acts to occur, including the violation of numerous safety standards relating to device manufacturing, quality assurance/control, and conformance with design and manufacturing specifications. Medtronic's misfeasance and malfeasance caused

4

Plaintiff to suffer injury and damages.

13.     Covidien and Medtronic (collectively referred to as "Defendants") are individually, jointly, and severally liable to Plaintiff for damages suffered by Plaintiff arising from Defendants' design, manufacturing, marketing, labeling, distribution, sale, and placement of the defective Covidien Products at issue in this suit. All acts were effectuated directly or indirectly through Defendants' respective agents, servants, employees, and/or owners, acting within the course and scope of their representative agencies, services, employments, and/or ownership.

## FACTS COMMON TO ALL COUNTS

**Surgical Staplers**

14.     Surgical staplers for internal use have the primary function of delivering staples to tissues inside the body during both minimally invasive (laparoscopic) and open surgery when removing part of an organ (resection), cutting through and sealing organs and tissues (transection), or creating connections between structures (anastomoses).[1]

15.     Most staplers are categorized as either linear or circular. While linear staplers are used primarily to connect tissues or remove organs, circular staplers are often used in surgeries of the digestive tract and colon. Typically, circular staplers fire two staggered rows of staples from a circular cartridge, which allows the stapler to connect two sections of the intestine, or another tube-like structure, after a portion has been removed. The staples cause the excised tissue to form rings or 'donuts' between the staples. A built-in blade then cuts off the overlaying tissue, sealing the new connection.

16.     During the procedure in question, the following products manufactured by defendants were used: DST Series EEA Stapler (EEA28), Endo GIA Reload with Tri-Staple

---

[1] *Surgical Staplers and Staples*, FDA.GOV, https://www.fda.gov/medical-devices/general-hospital-devices-and-supplies/surgical-staplers-and-staples (last updated October 7, 2021).

Technology (EGIA45AMT and EGIAUXL), GIA Stapler with DST Series Technology (GIA8038L and GIA8038S), Signia Stapler with Tri-Staple Technology (SIGC60MT and SIGLU60A), and TA Stapler with DST Series Technology (TA6035S). Upon information and belief, the specific surgical stapler at issue in this suit is the Covidien Medtronic EEA28, which is part of the EEA (End-to-End Anastomosis) staplers with DST (Directional Stapling Technology) Series line. These circular end-to-end anastomotic staplers are available in many shaft lengths, made in various anvil diameters to accommodate different lumen sizes, and can be loaded with staples of varying heights depending on tissue type (*see Figure 1*). Peter Lumaghi's medical billing records show that the particular EEA28 model that injured him had a 22 cm shaft, 28 mm lumen size, and was loaded with 4.8 mm staples (*see Figure 2*).

*Figure 1*

## EEA™ Circular Stapler with DST Series™ Technology

MEDTRONIC

| Lumen Size | Device | Reorder Code | Color Code | Staple Height | Tissue Type |
|---|---|---|---|---|---|
| 21 mm | | EEA2155 | Aqua | 3.5 mm | Medium |
| | | EEA21 | Aqua | 4.8 mm | Thick |
| | | EEAXL2155 | Aqua | 3.5 mm | Medium |
| | | EEAXL21 | Aqua | 4.8 mm | Thick |
| 25 mm | | EEA2535 | White | 3.5 mm | Medium |
| | | EEA25 | White | 4.8 mm | Thick |
| | | EEAXL2535 | White | 3.5 mm | Medium |
| | | EEAXL25 | White | 4.8 mm | Thick |
| 28 mm | | EEA2835 | Blue | 3.5 mm | Medium |
| | | EEA28 | Blue | 4.8 mm | Thick |
| | | EEAXL2835 | Blue | 3.5 mm | Medium |
| | | EEAXL28 | Blue | 4.8 mm | Thick |
| 31 mm | | EEA31 | Green | 4.8 mm | Thick |
| | | EEAXL31 | Green | 4.8 mm | Thick |
| 33 mm | | EEA33 | Yellow | 4.8 mm | Thick |
| | | EEAXL33 | Yellow | 4.8 mm | Thick |

*Figure 2*



## Surgical Stapler Failure and Malfunction

17.    The risk of failure and malfunction of surgical staplers has been well-known to the Defendants since the start of the device's widespread use in the early 1990s and the figures pulled from these studies are startling. For example, by 2001, Defendants knew, or should have known, that 112 deaths, 2,180 injuries, and 22,804 adverse events (AEs) associated with device malfunction had been reported to the FDA's Manufacturer and User Facility Device Experience (MAUDE) database.[2] The sheer bulk of AEs should have signaled the Defendants that there was a defect in their product.

18.    The pattern continued. From January 2006 to January 2016, there was a total of 13,312 reports, with 106 events resulting in death, 3,234 resulting in injury, and 9,972 involving a device malfunction.[3] To put these numbers into perspective, over this 10-year period 75% of all reported stapler-related events involved device malfunction, and more than 25% resulted in injury or death.

19.    The FDA recently reported that during the time period from January 1, 2011, through December 31, 2018, it received close to 110,000 reports related to issues with surgical staplers. Of these, 412 were submitted as deaths, 11,181 were submitted as serious injuries, and

---

[2] S. Lori Brown, *Surgical Stapler-Associated Fatalities and Adverse Events Reported to the Food and Drug Administration*, 199 J. AM. COLL. SURG. 3, 374 (Sept. 2004)
[3] MK Riggs, *Examining Relationships Between Device Complexity and Failure Modes of Minimally Invasive Surgical Staplers*, 3 Biomedical and Biotechnology Engineering (Feb. 2017)

98,404 were submitted as malfunctions.[4] To make matters worse, over half of these adverse event reports were not submitted into MAUDE, but to a secret FDA database. This abuse of FDA policy to the extreme detriment of thousands of patients like Peter Lumaghi will be discussed at length in another section.  All of this information – from 2001 to 2019 – was known to Defendants.

**Manufacturer-Created Knowledge Gap**

20.      In many operations, surgical staplers are used to ligate and divide major blood vessels and other structures.  The device cuts the tissue, and then it staples the open tissue closed. This frequently occurs in laparoscopic procedures, which are greatly facilitated by using surgical staplers and are associated with lower risk of surgical site infection. This less invasive form of surgery does not require large incisions, and surgical staplers allow surgeons to perform procedures within laparoscopic operations that carry a high risk of infection, such as anastomoses, more rapidly.[5]  However, there is no pause and no indicator of stapler success before the cutting blade activates.[6] Additionally, adequate grip strength is necessary to fire the stapler, yet too much force too quickly can put pressure on delicate tissue and damage it.[7] The device's complexity is perhaps best illustrated by the complicated process of choosing the right stapler and corresponding staple cartridge for the specific type of tissue involved in a procedure. The selection of a stapler based on shaft length, lumen size, and stapler height can have a great effect on the clinical outcome. Stapler height in particular is a key decision, as choosing a staple height that is incompatible with a specific tissue's thickness and biomechanical properties can lead to anastomotic leaks, tissue

---

[4] *FDA Executive Summary Prepared for the May 30, 2019, Meeting of the General and Plastic Surgery Devices Panel: Reclassification of Surgical Staplers for Internal Use*, FDA.GOV, https://www.fda.gov/media/126211/download (last updated July 2, 2019).

[5] Y. Kagawa, *The association between the increased performance of laparoscopic colon surgery and a reduced risk of surgical site infection*. 49 Surg Today 474 (Jan. 2019).

[6] Helen J. A. Fuller, *Surgical Stapler Adverse Events in the Veterans Health Administration: Root Causes and Lessons Learned*, 3 Proceedings of the International Symposium on Human Factors and Ergonomics in Health Care 1, 153 (June 2014)

[7] *Id.*

damage, and other complications. A variety of model types and functionality provide customized tool selection, but the same choices make consistent safe use difficult.[8] Despite the importance of this selection, very little guidance is provided by Defendants, and staple selection and operation is therefore largely based on anecdotal evidence and the practices of attending surgeons passed down from teacher to student at each institution.[9]

21.    Doctors and surgeons appropriately depend upon the manufacturers to educate them on their products, which Covidien fails to do adequately. Surgical staplers are constantly evolving and being created for an ever-increasing list of procedures, without sufficient training, instruction, and education. Therefore, Defendants have created a 'knowledge gap' in the medical community concerning safe use of the product.

22.    For example, in a cohort study of 210 laparoscopic general surgery cases over a two-year period, medical device-related interruptions during procedures occurred frequently and were classified into five distinct categories, of which device failure was the most common. Laparoscopic staplers contributed to over 50% of these device failures and 25% of all interruptions of any category.[10] The authors attribute the pervasiveness of surgical stapler failure in their research to the "accelerated innovation and development [of surgical staplers] and lack of systematic data collection after the implementation of surgical devices."[11]

23.    The Defendants knew, or should have known, about this knowledge gap discussed at length in a 2014 medical literature review published by doctors with industry ties. The review cites a previous study which identified a wide educational gap in surgical stapling and posits that

---

[8] Fuller, *supra.*
[9] Edward Chekan, *Surgical stapling device-tissue interactions: what surgeons need to know to improve patient outcomes*, 7 Med Devices Auckl. 305 (Sept. 2014).
[10] James J. Jung, *Characterization of device-related interruptions in minimally invasive surgery: need for intraoperative data and effective mitigation strategies*, 33 Surg Endosc. 3, 717 (March 2019)
[11] *Id.*

in order to bridge the educational gap, the surgical stapler manufacturing industry must work together with the medical community:

> McColl et al created a multiple-choice test to assess general surgery residents' knowledge on the purpose and function of linear, circular, and laparoscopic staplers. The test was administered both before and after a 40-minute didactic teaching lecture delivered through a collaborative effort between an attending general surgeon and industry representative with comprehensive knowledge of stapling devices. Mean test scores significantly increased from 53% (pretest) to 77% (posttest), (P<0.05). In this small group (n=26), this study again identifies a significant gap in existing stapling knowledge and showed the feasibility and value of industry–surgeon collaboration to develop an effective educational program for clinicians.[12]

The authors later double down on their conclusions regarding education needed to avoid patient injury by ensuring surgeons are adequately informed on the safe use of the device, stating that:

> Bringing the surgical community together with other professionals in the device industry, such as stapler manufacturers, engineers, and scientists, to collaborate on the development of educational programs to keep surgeons apprised of the optimal use of medical devices should be a national priority. To facilitate this process, *currently available data* need to be *collected in a principal location* and critically assessed and summarized. Further, prospective databases into which surgeons can *enter specific case information* regarding their stapling practices (*type of stapler*, staple size, tissue thickness, etc.) and short term clinical results (leak, bleeding, stricture, and diversion rates) need to be developed. Purposefully and carefully studying current stapling methods will, hopefully, lead to the development of more specific and scientifically based recommendations regarding the choice of staple height and best stapling methods for the diverse range of clinical situations encountered by surgeons. (Emphasis added)[13]

24.     The FDA recognized this need to gather data on specific surgical devices and the negative clinical cases associated with them. Since the 1990s, the FDA has given manufacturers, the medical community, and the public at large access to the MAUDE Database (the Manufacturer and User Facility Device Experience Database) for all surgical and medical devices. A 2017 journal article describes MAUDE in the following manner:

> MAUDE contains over four million medical device adverse event and product problem reports dating back to 1991. With nearly two thousand new adverse event and product problem reports submitted every day the MAUDE database is an important tool for

---

[12] Chekan, *supra*.
[13] *Id.*

monitoring and investigating safety issues involving medical devices. MAUDE has facilitated the identification and investigation of medical product problems ranging from cardiovascular and gynecological devices to stretchers and tanning beds.[14]

In regard to its utility to the medical community and ability to search for specific products, the authors state:

> The FDA uses MAUDE reports to monitor device performance, detect potential device-related safety issues, and inform the risk-benefit assessments of these products. Health care professionals use MAUDE to review events associated with specific products, body systems or procedures. More than 120 articles referencing MAUDE have been published to date, the majority of these summarizing adverse events specific to a particular outcome, product or body system.[15]

25.     For surgeons who use a variety of surgical devices daily, MAUDE allows them to familiarize themselves with new technologies and identify and analyze trends in malfunctions. Over the 20-year period in which the ASR reporting system remained an industry secret, "[d]ata from MAUDE also established what was assumed to be the baseline incidence and prevalence of surgical device malfunctions and related patient harm or death. Other studies used this data to assess the safety and efficacy of staplers for procedures in the specialties of colorectal, pancreatic, bariatric, and robotic surgery."[16]

26.     As one of the largest surgical stapler manufacturers in the world, Covidien has been in possession of massive amounts of data on surgical stapler-related injuries, fatalities, and malfunctions. But rather than contributing this knowledge to the powerful MAUDE database, Defendants purposely kept this information from the attention and scrutiny of the public. As will be discussed in depth below, in the almost seven years preceding Peter Lumaghi's colorectal procedure and subsequent death, the medical providers who performed his surgery were deprived

---

[14] Lisa Garnsey Ensign, *A Primer to the Structure, Content and Linkage of the FDA's Manufacturer and User Facility Device Experience (MAUDE) Files*, 5 EGEMS Wash DC 1, 12 (June 2017).

[15] *Id.*

[16] Samwel Okoth Makanyengo, *Literature Review on the Incidence of Primary Stapler Malfunction*, 27 Surgical Innovation 2, 229 (Dec. 2019).

11

of over half of Covidien's data on adverse events associated with its staplers, totaling over 56,000

reports that were never publicly submitted.

**Alternative Summary Reporting**

27.     It was in this era of clandestine reporting that Peter Lumaghi's initial surgery (July

25, 2018) and subsequent untimely death (October 3, 2018) occurred, a context which is critical

to understanding how a defective surgical stapler ended up in the hands of his surgeon, Dr. Radhika

Smith. Per the FDA's Executive Summary issued in May 2019:

> Prior to February 2019, surgical staplers for internal use were also eligible for the ASR
> Program. This program enabled manufacturers of certain device types to submit quarterly
> summary reports of specific well known and well characterized events in lieu of individual
> reports of each such event. FDA carefully reviewed and considered all such reports, but
> reports prior to 2017 were not made publicly available because the format was not
> compatible with the public database. [17]

28.     The existence and subsequent corrupted use of the aforementioned Alternative

Summary Reporting (ASR) Program was publicly revealed in a March 2019 article by Christina

Jewett of Kaiser Health News (KHN). The investigative piece featured insights from various ex-

FDA officials who worked for the agency at the inception and throughout the lifespan of the ASR

program, including Larry Kessler. The origins of the ASR program, which was in place from 1997

until it was formally ended in June 2019, are described in the following manner:

> The alternative summary reporting program started two decades ago with a simple goal: to
> cut down on redundant paperwork, according to officials who were at the FDA at the time.
>
> Kessler, the former FDA official, said the program took shape after scandals over under-
> reporting of device problems spurred changes allowing criminal penalties against device
> companies.
>
> Soon, thousands of injury and malfunction reports poured into the agency each month, with
> about 15 staff members dedicated to reviewing them, Kessler said. Many reports were so
> similar that reviewing them individually was "mind-numbing." Kessler went to the FDA's
> legal department and to device manufacturers to propose a solution.

---

[17] *FDA Executive Summary, supra.*

12

Device makers would be able to seek a special "exemption" to avoid reporting certain complications to the public database. The manufacturers would instead send the FDA a spreadsheet of injury or malfunctions each quarter, half-year or year.

That way, Kessler said, reviewers could quickly look for new problems or spikes in known issues. When the program launched in 2000, the list of exempted devices was made public and only a few devices were involved, Kessler said.

In 2019, for reasons as yet unknown, the list of exempted products was no longer public. "I don't know why it's not [made public] now," Kessler said. "I'm surprised about that."[18]

29.     The series of articles by KHN, in combination with its many FOIA requests, eventually spurred the FDA to release all of its previously undisclosed ASR data.[19] Comparing this secret data with the data that had been publicly available revealed some shocking statistics from the years preceding Peter Lumaghi's surgery. This data is summarized by the bullet points below:

- In 2011, Covidien submitted over **4,800** adverse event reports related to surgical staplers to the ASR program. Over **130** of those were specifically related to the EEA28 surgical stapler.
- In 2012, Covidien submitted over **6,800** adverse event reports related to surgical staplers to the ASR program. Over **150** of those were specifically related to the EEA28 surgical stapler.
- In 2013, Covidien submitted over **6,400** adverse event reports related to surgical staplers to the ASR program. Over **100** of those were specifically related to the EEA28 surgical stapler.
- In 2014, Covidien submitted over **14,000** adverse event reports related to surgical staplers to the ASR program. Over **190** of those were specifically related to the EEA28 surgical stapler.
- In 2015, Covidien submitted over **8,900** adverse event reports related to surgical staplers to the ASR program. Over **160** of those were specifically related to the EEA28 surgical stapler.
- In 2016, Covidien submitted over **9,900** adverse event reports related to surgical staplers to the ASR program. Over **170** of those were specifically related to the EEA28 surgical stapler.

---

[18] Christina Jewett, *Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, KAISER HEALTH NEWS, https://khn.org/news/hidden-fda-database-medical-device-injuries-malfunctions/, (March 7, 2019).
[19] *MDR Data Files*, FDA.GOV, https://www.fda.gov/medical-devices/medical-device-reporting-mdr-how-report-medical-device-problems/mdr-data-files, (last updated June 21, 2019).

- In 2017, Covidien submitted over **4,700** adverse event reports related to surgical staplers to the ASR program. Over **40** of those were specifically related to the EEA28 surgical stapler.

30. Comparing the ASR-reported figures to the MAUDE numbers shows the scope of potential life-saving knowledge that was hidden from medical providers. This is illustrated by the table and bullet points below:

| Year | Covidien Surgical Stapling Entries in ASR Program* | Covidien Surgical Stapling Entries in MAUDE | Covidien EEA28 Entries in ASR Program* | Covidien EEA28 Entries in MAUDE |
|---|---|---|---|---|
| 2011 | 4,800 | 0 | 130 | 0 |
| 2012 | 6,800 | 747 | 150 | 0 |
| 2013 | 6,400 | 894 | 100 | 0 |
| 2014 | 14,000 | 1,316 | 190 | 10 |
| 2015 | 8,900 | 1,111 | 160 | 45 |
| 2016 | 9,900 | 1,693 | 170 | 67 |
| 2017 | 4,700 | 5,037 | 40 | 116 |
| 2018 | - | ~11,000 | - | 142 |

*Numbers have been rounded to nearest ten or hundred

- From January 1, 2011, through December 31, 2018, the FDA received almost 110,000 reports related to issues with surgical staplers.
- Over half of these reports–56,277 in total–were submitted secretly through the ASR program.
- Going back further to 2001, this number increases to more than 66,000.

**The Effects of ASR Program Abuse**

31. While the FDA's reason for using this program may have been a pragmatic one, manufacturers like Covidien Medtronic chose to over-report via ASR and under-report via MAUDE for one clear motive: profit. The secrecy of the ASR program was advantageous to sales representatives and company executives alike, shielding them from public scrutiny and allowing them to provide potential buyers with only the publicly reported adverse event reports associated with their products. The ability to hide malfunctions and injuries associated with Covidien products undoubtedly increased their merchantability. To put it in perspective, a Covidien sales

representative promoting an EEA28 surgical stapler in 2017, just one year before Peter Lumaghi succumbed to an infection stemming from a procedure with that stapler, would be able to omit approximately 25% of the total number of adverse events reported for that year when making a sales pitch. If looking to promote the safety and reliability of Covidien's surgical stapling system as whole, that same salesperson could hide roughly 50% of the total number of adverse events, only being obligated to disclose just about 5,000 out of the roughly 10,000 reported malfunctions and injuries.

32.    The sheer magnitude of surgical stapling system-related reports that were submitted via ASR clearly suggests a level of risk that was unknown to researchers, physicians, and the public alike. Despite this, data analysis suggests that the longer this secretive reporting system went undetected, the more emboldened Covidien became. From 1999 to 2018, Covidien surgical stapler reports to ASR increased yearly versus MAUDE, with a positive correlation between number of reports to ASR and calendar year. In contrast, the MAUDE database showed negative trends over the calendar years for surgical staplers, with the rate of reporting on surgical staplers decreasing annually by 24%. In total, 84.4% of all surgical stapler malfunctions were reported via ASR, with a peak of 97.9% of all surgical stapler malfunctions being secretly reported in 2014.[20] Covidien reaped great benefits from that year of excessive secret reporting, as it was acquired by Medtronic in 2015. According to Medtronic's fourth quarter and fiscal year 2015 financial results, the company's Surgical Solutions branch, which includes surgical staplers, posted a revenue of $1.293 billion and cited staplers as major drivers of revenue performance.[21]

---

[20] Derek A. Benham, *Revealing the scope of surgical device malfunctions: Analysis of the "hidden" Food and Drug Administration device database*, 221 AM. J. SURG. 6, 1121 (June 2021).

[21] *Medtronic Reports Fourth Quarter and Fiscal Year 2015 Financial Results*, GLOBE NEWS WIRE, https://www.globenewswire.com/news-release/2015/06/02/1891811/0/en/Medtronic-Reports-Fourth-Quarter-and-Fiscal-Year-2015-Financial-Results.html, (June 2, 2015).

33.     While Covidien enjoyed increasing economic benefits from the ASR program as time went on, the medical community was denied critical information that could have informed their decisions to select one Covidien stapler over another or to purchase any Covidien stapling products at all. By keeping the scope of injuries related to surgical staplers hidden, surgeons only had access to the diluted public reports, which meant that injuries, malfunctions, and trends did not seem as prevalent. Some of this essentially non-reporting also involved new and novel malfunctions that caused severe injury and would have subjected their staplers to recall or reclassification.

34.     Perhaps most importantly, the lack of public information and post-market reporting from Covidien adversely affected the knowledge and decision making of experts like the surgeon who performed Peter Lumaghi's procedure, creating a dangerous landscape in which to be operating and preventing the surgeons from making informed decisions. Covidien's conduct directly led to Peter Lumaghi's physician electing to use a surgical stapler without full knowledge of all foreseeable risks.

**2018 Recall #1 of Substantially Equivalent Covidien Circular Stapler**

35.     In addition to the EEA circular stapler with DST technology series, Covidien manufactures a line of circular staples called the EEA Hemorrhoid and Prolapse Stapler set with DST technology series. Like the EEA28, it places a circular, double-staggered row of titanium DST staples and removes a circular tissue specimen. While it is used in the control of rectal prolapse and hemorrhoid disease, it also has application in the lower alimentary tract for the creation of end-to-end and end-to-side anastomoses.

36.     In April 2018, three months prior to Peter Lumaghi's surgery, Covidien initiated a recall of both the 3.5 mm and 4.8 mm staple varieties of this circular stapler (product codes

16

HEM3335 and HEM3348) due to a "…potential for improper welding of the yellow staple guide to the instrument." This is a highly dangerous defect, as use of a stapler with an improperly welded staple guide "may result in improper staple formation potentially leading to bleeding or anastomotic leak." The FDA described this as "nonconforming material/component" in its manufacturing process.

37.     This circular stapler is substantially similar to the EEA28 that injured Peter Lumaghi. In fact, when Covidien submitted its Section 501(k) premarket notification of intent to market the device in December 2008, it used the EEA circular stapler with DST technology as a **predicate device**.[22] Premarket Notification [510(k)] is a premarketing submission made to the FDA to demonstrate that the device is safe and effective by proving substantial equivalence (SE) to a legally marketed predicate device that is not subject to Premarket Approval (PMA). Under "Technological Characteristics" in the FDA submission, Defendants wrote that "the EEA Hemorrhoid Stapler and accessories are substantially equivalent to the predicate devices with regard to the stapling technologies."

38.     Given the substantial technical similarity between the two staplers, it is more likely than not that the design processes, manufacturing processes, and quality control measures associated with these staplers are also shared. The surgery that caused Peter Lumaghi's injuries took place less than four months before the recall was initiated, and his particular injury, anastomotic leak, was a known consequence of this defect.

---

[22] A predicate device is represented by the manufacturer to have the same intended use and technological characteristics as the new device, which must be confirmed with data and testing. Any differences between the devices must be minimal enough so as to not raise questions regarding the new device's safety and effectiveness. Successful selection of a predicate device sets a manufacturer on the favorable 510(k) clearance pathway, which does not require clinical trials to market a new device and instead relies on the assumption that the risk-benefit profile of the new device will be similar to the predicate device's profile.

**2018 Recall #2 of Substantially Equivalent Covidien Circular Stapler**

39.     The EEA circular stapler with DST technology series, which includes the EEA28 that injured Peter Lumaghi, has been technologically eclipsed by its purportedly safer and more advanced successor: the EEA circular stapler with Tri-Staple technology series. This new line of circular staplers deploys three rows of staples that vary in height, while its predecessor deploys two rows of staples of uniform height. To exempt the device from premarket approval, Covidien submitted a Section 501(k) premarket notification of intent to market the device on February 14, 2018. The predicate device listed on the submission is the EEA28, which required Covidien to detail the litany of similarities between the two devices. Under "Basis for the Substantial Equivalence," Defendants wrote:

> The EEA circular stapler with Tri-Staple technology has the same intended use as the identified predicate device. They are similar in ·fundamental scientific technology in that they are all sterile, hand-held, manual surgical instruments equipped with titanium staples intended to be used during open or laparoscopic surgical procedures of the alimentary tract, to create anastomoses (end-to-end, end-to-side, or side-to-side) via intraluminal (within the lumen) resection. The proposed and predicate devices are similar in design, materials and are sterilized via ethylene oxide.

Based on these facts (*see Figure 3*), the FDA cleared the device two days after receiving the submission and the new EEA Circular Stapler with Tri-Staple Technology (product codes TRIEEA28MT, TRIEEA28XT, TRIEEA31MT, and TRIEEA31XT) was subsequently launched into commerce worldwide.

*[this space intentionally left blank]*

18

*Figure 3*

| | Proposed Device<br>EEA™ Circular Stapler with Tri-Staple™ Technology | Predicate Device (K062850)<br>EEA™ Circular Stapler with DST Series™ Technology |
|---|---|---|
| Manufacturer | Covidien | Covidien |
| Constructional | | |
| Indications for Use | The EEA™ Circular Stapler with Tri-Staple™ Technology has application throughout the alimentary tract for the creation of end-to-end, end-to-side and side-to-side anastomoses in both open and laparoscopic surgeries. | The EEA™ Circular Stapler with DST™ Staple Technology has application throughout the alimentary tract for the creation of end-to-end, end-to-side and side-to-side anastomoses in both open and laparoscopic surgeries, including bariatric surgery. |
| Operation Method | Manual | Manual |
| Anatomical Site | Alimentary tract | Alimentary tract |
| Surgical Approach | Open and laparoscopic | Open and laparoscopic |
| Staple Rows | 3 staggered rows of staples with different staple height in each staple row | 2 staggered rows of staples with same staple height in each staple row |
| Staple Height | 3.0mm, 3.5mm, 4.0mm | 3.5mm<br>4.8mm |
| Shell Diameter | 28mm/31mm/33mm | 21mm/25mm/28mm/31mm/33mm |
| Stapler Length | Standard length: 22cm<br>Extra length XL: 35cm | Standard length: 22cm<br>Extra length XL: 35cm |
| Audible Feedback | Yes | Yes |
| Anvil Head | 3 staggered rows of anvil bucket. Lipless design | 2 staggered rows of anvil bucket, Lipped design |
| Safety Lever | Red color | White color |
| Patient Contact Material(s) | Staple (implant): Titanium per ASTM F67 Grade 1<br>Knife: 440 Stainless Steel<br>Anvil: 17-4 Stainless Steel<br>Tube: Aluminum 6061 T-6 | Staple (Implant): Titanium per ASTM F67 Grade 1<br>Knife: 440 Stainless Steel<br>Anvil: 17-4 Stainless Steel<br>Tube: Aluminum 6061 T-6 |
| Biocompatibility | Yes, per ISO 10993-1 | Yes, per ISO 10993-1 |
| Single Use | Yes | Yes |
| Sterile | Ethylene oxide | Ethylene oxide |
| Shelf Life | 5 years | 5 years |

40.    However, less than six months later on August 17, 2018, Defendants initiated a recall of the brand new stapler series. According to the FDA recall database, the reason for the recall was the "…potential for a device to have an incorrect tissue gap. Use of a device with an incorrect tissue gap may result in incomplete staple formation and/or the inability to remove the device from tissue following application potentially leading to bleeding, anastomotic leak or tissue trauma." This incorrect tissue gap was caused by a "process design" defect.

41.    Given the extreme technical similarity between the two staplers, it is highly likely that the design processes, manufacturing processes, and quality control measures associated with each stapler are also shared. Peter Lumaghi's injurious initial surgery took place less than one

19

month before the recall was initiated, and his particular injury, anastomotic leak, was a known consequence of this defect.

42.    This defective tissue gap would have the potential to wreak even more havoc on patients whose surgeons used the original, more rudimentary EEA28. Despite its substantial equivalence to the newer version, the EEA28 was by design less safe than its successor. Covidien has stated that its internal studies show that the EEA28 provides 50% less security to the staple line, requires 33.3% more force to fire, and yields 30% less security at the staple line during the post-surgical healing period. These native flaws themselves are enough to cause a staple line failure and anastomotic leak, and they are even more dangerous in combination with an incorrect tissue gap.

**Defective Product Family**

43.    In addition to the lack of manufacturing quality control that these defects within the family of Covidien EEA circular staplers denote, the August 2018 recall due to an incorrect tissue gap is particularly concerning given the extreme importance of device-tissue analysis pre-surgery and interaction during and after surgery. Performance of surgical staplers relies on an optimal compression force that allows for proper tissue approximation and the creation of a stable anastomosis yet spares tissue from shearing or injury.[23] Intrinsic biomechanical properties of tissue vary along with the tissue types and thickness, and these properties determine both the optimal compressive force and compression time before firing the device.[24]

44.    A 2020 study has identified an issue with fixed-style surgical staplers like the EEA28. Fixed-style staplers are devices that present a bar indicator window featuring a green bar that shows when proper compression of tissue is achieved. The instructions for users describe that

---

[23] Riggs, *supra*.
[24] *Id.*

20

the "green bar must be visible in the indicator window before releasing the safety lever prior to firing."[25] Nonetheless, even if the green bar is only partially visible, the EEA is designed to enable firing. This limited indicator window combined with the lack of detailed mention of using partial or full visualization of the green bar for optimal compression in the IFU of the EEA device means that surgeons can fire staples without first having achieved optimal compression.[26] Without being able to clearly and easily recognize optimal compression levels, a surgeon like Peter Lumaghi's can form a staple line which appears patent, but later fails and causes an anastomotic leak, which is exactly the clinical outcome that Plaintiff suffered in the instant case.

45.    The potential for these device-tissue interactions to lead to negative results for patients is obvious in the new recommended contraindications and warnings promulgated by the FDA in its final order to reclassify surgical staplers. The FDA has suggested the following additions specifically regarding tissue to be stapled:

- Unless data demonstrates the safety of doing so, contraindications must be identified regarding use of the device on tissues for which the risk of stapling outweighs any reasonably foreseeable benefit due to known complications, including the stapling of tissues that are necrotic, friable, or have altered integrity.
- Unless available information demonstrates that the specific warnings do not apply, the labeling must provide appropriate warnings regarding how to avoid known hazards associated with device use including:
  o Avoidance of use of the stapler to staple tissue outside of the labeled limits for maximum and minimum tissue thickness.
  o Avoidance of clamping and unclamping of delicate tissue structures to prevent tissue damage.
- Specific user instructions for proper device use including measures associated with the prevention of device malfunction, and evaluation of the appropriateness of the target tissue for stapling.
- Information regarding tissues on which the stapler is intended to be used.[27]

---

[25] Gyung Mo Son, *Compression injury of the circular stapler for gastrointestinal end-to-end anastomosis: preliminary in-vitro study*, 99 ANN. SURG. TREAT. RES. 2, 72 (Aug. 2020).
[26] *Id.*
[27] https://www.govinfo.gov/content/pkg/FR-2021-10-08/pdf/2021-22041.pdf

46.     This entire product family of circular surgical staplers, and more specifically the EEA28 model that is at issue in this action, was designed, manufactured, and marketed by Defendants, and malfunctioned during Peter Lumaghi's surgery. That malfunction caused him to undergo subsequent surgeries and extensive medical treatment and ultimately led to his death. As a direct and proximate result of the actions and/or omissions by the Defendants, Peter Lumaghi suffered serious and permanent injuries and damages, including but not limited to:

(a)     Sepsis;

(b)     Multiple surgeries;

(c)     Placement of an ileostomy;

(d)     Lost chance of recovery or survival;

(e)     Pain, suffering, mental anguish, fear, loss of enjoyment of life and emotional distress; and

(f)     Medical expenses.

47.     Alternatively, in addition to the injuries and damages set forth above, the defective and/or malfunctioning device was a contributing cause of Peter Lumaghi's death.

**GENERAL ALLEGATIONS**

48.     Defendants design, manufacture, and sell EEA Circular Staplers, surgical staplers to be used by medical service providers in surgical procedures. The staplers come in various models, to assist surgeons in creating a secure anastomosis within the body and form a seal.

49.     Defendants designed, manufactured, and sold a defective product family of EEA Circular Staplers which were available in the market to be used in surgical procedures before, during, and after the time of Mr. Lumaghi's surgery. These staplers frequently malfunctioned and were defective, compromising staple integrity and surgical procedures, with the potential to lead

22

to patients' death or serious injuries when used by a surgeon, even as instructed by Defendants in the device user manual.

50.     On or about April 2018, and again on or about August 2018, both prior to and immediately after using the device on Mr. Lumaghi, Defendant Covidien initiated recalls of product lines within the EEA circular stapler family to which the EEA28 belongs and is substantially equivalent.  Specifically, Covidien identified two defects which could result in incomplete staple formation and potentially lead to an anastomotic leak.

51.     On June 26, 2018, Peter Lumaghi presented to Barnes Jewish West County Hospital in St. Louis, Missouri, for evaluation of rectal cancer.

52.     On July 25, 2018, Mr. Lumaghi returned to Barnes Jewish West County Hospital and underwent laparoscopic low anterior resection and flexible sigmoidoscopy.  A Covidien EEA28 DST series with 4.8 mm staples was used during the surgery to create the anastomosis. Mr. Lumaghi was never informed that the device belonged to a defectively designed and manufactured product group of circular staplers.

53.     Four days after surgery, Mr. Lumaghi developed increased abdominal pain, cough, and decreased urination.  On July 30, 2018, now five days after surgery, Mr. Lumaghi again presented to Barnes Jewish West County Hospital, this time to the Emergency Department. A Computerized Tomography (CT) study of Mr. Lumaghi's abdomen and pelvis showed fluid and gas collection adjacent to the colonic anastomosis.  Mr. Lumaghi was readmitted to the hospital.

54.     A CT scan on August 2, 2018, showed an anastomotic leak with interval development of peritonitis and abscess formation.  In other words, Mr. Lumaghi's bowels had leaked into his peritoneum and caused an infection. Analysis of the fluid from the abscess revealed Gram-Negative Bacilli and Gram-Positive Cocci.  By August 5, 2018, the preliminary culture

23

results of the abscess showed heavy growth of Multiple Gram-Positive and Gram-Negative organisms.

55.     On August 6, 2018, Mr. Lumaghi underwent laparoscopic pelvic washout, flexible sigmoidoscopy, open repair of colorectal anastomosis and diverting loop ileostomy due to the anastomotic leak.  He had not received an ileostomy until the anastomotic leak.

56.     During the emergent repair surgery, a pinpoint air leak was appreciated from the left lateral aspect of the anastomosis.  It was repaired, not with another Covidien circular stapler, but using 3-0 Vicryl suture x2.  The pelvis and abdomen were copiously irrigated.  Still, the wound classification was grade 4 due to acute infection and inflammatory process.

57.     On September 29, 2018, while still recovering from the anastomotic leak with the development of multiple intra-abdominal loculated abscesses, Mr. Lumaghi was admitted to Baptist Medical Center in St. Louis, St. Louis County, Missouri.  His blood cultures grew Enterobacter, a Gram-Negative bacteria normally found in the intestinal flora.  The anastomotic leak and subsequent development of intra-abdominal abscesses contributed to the development of Mr. Lumaghi's sepsis.

58.     Mr. Lumaghi died on October 3, 2018, at 12:15 a.m.  The death certificate lists septicemia as one of the causes.  The infection started with the anastomotic leak, which was caused by the Covidien EEA circular stapler.

59.     As a result of the defective nature of the EEA circular stapler, Mr. Lumaghi suffered grievous injury requiring a prolonged hospitalization and/or death.

60.     Plaintiff alleges, upon information and belief, that the specific circular stapler that failed to form a lasting staple line during Mr. Lumaghi's initial July 25, 2018, surgery was a model known by Defendants to frequently malfunction. In fact, models substantially equivalent to that

24

stapler were recalled both before and after his surgery.

61.     Plaintiff alleges that Mr. Lumaghi's stapler was among a class of staplers known by Defendants to malfunction or to contain defects, whether it was included specifically in a recall or not.

62.     Manufacturers of medical devices such as Defendants must provide reports to MAUDE when they learn that any of their devices contributed to death or serious injury. An alternative reporting system (ASR) was established, though, for reporting well-known and well-characterized events on a summary basis. Here, Defendants misused that system. They did so to dilute reports, so that the injuries did not seem as prevalent; this included the non-reporting of events involving new and novel malfunctions that caused severe injury and would have subjected their staplers to recall or reclassification. In fact, these recalls occurred as soon as the issue was discovered and published in 2019, and as of October 2021, surgical staplers have been reclassified to class II devices requiring special controls and premarket notification.

63.     The ASR system further requires accurate reporting of deaths, injuries, and malfunctions. Upon information and belief, Defendants reported various injuries merely as 'malfunctions' to avoid FDA scrutiny and attention and to forestall the chance that any of these reports would require public disclosure. Had these incidents been accurately reported, it is highly likely that public notice, FDA scrutiny, and product recalls would have preceded Plaintiff's surgery, and that the devices would have been appropriately recalled before being used on Plaintiff by his unsuspecting surgeons.

64.     Defendants, and each of them, have manipulated the reporting systems in a way that ensured healthcare providers could not review the dangers posed by the products. Defendants also often listed injuries as 'malfunctions' to avoid attention that would have resulted in product

25

recalls or serious questions about whether the devices were properly classified in the very low risk category. Instead, Defendants, and each of them, have utilized an alternative summary reporting program that is not publicly accessible.

65.    By not reporting all stapler-related injuries on the publicly-available MAUDE database, Defendants have hidden the true risks of the using the devices from surgeons and their patients.

66.    Despite the ASR system, a manufacturer was still required to report deaths related to its product's use in the public MAUDE data base. This public Database shows that Medtronic has reported more than 250 deaths related to staplers or staples since 2001. Despite this manifest knowledge of the dangers associated with its products, Medtronic nevertheless still used reporting exemptions to hide stapler-related reports from public view by reporting them to an inaccessible database through July 2017. By doing so, Defendants intentionally concealed the many injuries caused by the use of its defective classes of surgical staplers. This concealment denied critical information concerning the safety of those products from not only the public, but from treating medical providers and surgeons, including the surgeons who performed Mr. Lumaghi's surgery (and patients like Mr. Lumaghi). Ultimately, Defendants continued to sell staplers to healthcare providers during this time period without disclosing serious risks of injury from use.

67.    Based on the number of stapler-related injuries, in May 2019, the FDA proposed reclassifying surgical staplers for internal use from Class I to Class II (Special Controls). Among other things, this required manufacturers, including Defendants, to publicly report all malfunctions or injuries related to the Covidien staple; device manufacturers, such as Covidien, are no longer able to use the reporting exemptions for injuries related to surgical staplers. Consequently, the number of public reports of deaths, injuries, and malfunctions skyrocketed from approximately

26

1,000 reports in 2015 to more than 11,000 reports in 2018. This reclassification was finalized in October 2021.

68.    While the reclassification brought transparency to the number of incidents involving the Defendants' products, it also revealed their concealment of the dangers posed by the products and demonstrated rank misrepresentations in the marketing of those products. Indeed, despite knowing that their staplers caused injuries due to malfunction, Defendants, and each of them, had undertaken to affirmatively represent and marketed their staplers were safe and effective. Defendants, and each of them, failed to include warnings regarding potential malfunctions that were known to them by virtue of, among other things, the reports that had theretofore been concealed in the ASR system. Defendants also failed to warn about the very risks described in the FDA publication.

69.    Defendants failed to: (1) provide warnings regarding the potential for their staplers to malfunction in the very manner that occurred during Plaintiff's surgery; (2) warn and inform surgeons of the potential for its staplers to malfunction in that manner, including all foreseeable use and misuse of the product; (3) train, instruct, and educate surgeons regarding safe use and foreseeable misuse of their product; and (4) recall their defective products when Defendants knew their surgical staplers were prone to injurious malfunction, and to timely and properly effectuate the recall. Through that conduct – as well as the affirmative concealment of the known risks of the products described above – Defendants engaged in willful, wanton, reckless, malicious behavior and/or exhibited a gross indifference to, and a callous disregard for human life, the safety and the rights of others, and more particularly, the rights, life, and safety of Mr. Lumaghi. That conduct was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement, and cost avoidance, to the virtual exclusion of all other considerations.

## COUNT I
## STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT
### (Against All Defendants)

70.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

71.     A manufacturer of a medical device or instrument, such as a surgical stapler, who sells or otherwise distributes a defective device is subject to liability for harm to persons caused by the defect. A medical device is defective if at the time of sale, the device departs from its intended design, even though all possible care was exercised in the preparation and marketing of the product.  Thus, a medical device is defective if at the time of sale, the device is manufactured in such a way that it poses harm and risk of injury when used by the intended consumer as the manufacturer intended.

72.     A reasonably prudent manufacturer of those products would or should also know that a stapler failing to form a stable anastomosis could cause serious injury or death because the procedure may need to be converted to an open procedure, and that even where it might cause only serious injury rather than death, the injured patient would require multiple hospitalizations, surgeries, and significant medical care to treat.

73.     A reasonably prudent manufacturer of surgical staplers would know that if it failed to exercise care in the manufacture of its product, its product could malfunction and/or fail to close a surgically repaired site properly and permanently, causing anastomotic leak and other serious, related harm.

74.     Defendants' stapler(s) were manufactured in such a way that deviated from their intended design and made those staplers unreasonably dangerous to the patient. The Defendants knew the specific staplers used on Mr. Lumaghi's surgical site contained a defect that caused it to

28

fail to perform the function it was intended to perform. Specifically, the failure to manufacture these staplers in compliance with their intended design resulted in a product that malfunctioned, causing an anastomotic leak, even after proper utilization by a surgeon. These manufacturing defects existed when the products left the manufacturers' control.

75. The manufacturing defect to the EEA circular stapler used in Mr. Lumaghi's July 25, 2018, surgical procedure was a substantial factor in producing Mr. Lumaghi's severe injuries when the stapler failed to provide an effective anastomosis.

76. Mr. Lumaghi's physician used the EEA circular stapler as directed for its intended purpose.

77. The EEA circular stapler used in Mr. Lumaghi's procedure had not been materially altered or modified prior to its use in Mr. Lumaghi.

78. As a direct and proximate result of the exposure to the defective EEA circular stapler, Plaintiff and Plaintiff's decedent suffered injuries and damages as described herein, including death.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT II
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (Against All Defendants)

79. Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

80. Pleading in the further alternative, a manufacturer must provide adequate warning of dangers inherent in the improper use of the product, and adequate instructions for the safe use

of the product. The warning must be in a form which could reasonably be expected to catch the attention of, and be understood by, the ordinary user. Thus, a medical device is defective if, at the time of sale, the warnings and instructions provided with the device fail to provide adequate warnings of the dangers inherent in the product's proper use.

81.     A reasonably prudent manufacturer of those products would also know that a stapler failing to fire staples could cause serious injury because the procedure may need to be converted to an open procedure, and that even where it might cause only serious injury, the injured patient would require multiple hospitalizations, surgeries, and significant medical care to treat.

82.     Defendants knew that their surgical staplers posed a risk to patients when used as intended because the circular stapler product lines were plagued by defects which could cause anastomotic leaks. Despite knowing this, Defendants failed to adequately warn potential surgeons or patients at the time they discovered, or should have discovered, the defective nature of their circular surgical staplers. Defendants were negligent for not providing sufficient notice or warnings of the risks associated with using the subject surgical staplers, including the risks associated with malfunction. Those inadequate warnings and instructions existed at the time the stapler(s) left the manufacturers' control.

83.     As a direct and proximate result of Defendants' failure to warn, Plaintiff and Plaintiff's decedent incurred losses and damages for personal injury, loss of use and enjoyment of life, and death.

84.     The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the

jury.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT III
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (Against All Defendants)

85. Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

86. Pleading in the further alternative, a product designer must not design a product which poses an unreasonable risk of danger to the product's user. Where a product is designed in such a manner that renders that product unreasonably dangerous, the product's designer can be liable for strict products liability for that defective design, even if all possible care was exercised in the design of the product. Thus, a medical device is defectively designed if its design poses an unreasonable risk of harm and injury to the intended consumer.

87. Decedent Peter Lumaghi was harmed by Defendants' defective surgical staplers, which were designed, distributed, manufactured, and sold by Defendants. Defendants' surgical staplers contained a design defect that made the products unreasonably dangerous to patients. Specifically, there was a design defect that would result in a stapler forming staple lines which failed, or failure to deploy staples, despite proper utilization by a surgeon. That design defect in the staplers existed when those products left the manufacturer's control.

88. The design defect to the EEA circular stapler used in Mr. Lumaghi's July 25, 2018, surgical procedure was a substantial factor in producing Mr. Lumaghi's severe injuries when the stapler failed to provide an effective anastomosis.

31

89.     Mr. Lumaghi's physician used the EEA circular stapler as directed for its intended purpose.

90.     The EEA circular stapler used in Mr. Lumaghi's procedure had not been materially altered or modified prior to its use in Mr. Lumaghi.

91.     Plaintiff alleges there were safer alternative designs of EEA circular staplers available to Defendants at the time the EEA circular stapler at issue in this case was sold. Those designs were reasonable, and economically and technologically feasible at the time the stapler at issue in this case was sold. Moreover, Plaintiff alleges that sutures are a safer alternative to surgical staplers in procedures such as that performed on Plaintiff's decedent on July 25, 2018. Further evidence of the safer alternative designs will be presented by Plaintiff's expert witnesses.

92.     As a direct and proximate result of Defendants' design defects, Plaintiff and Plaintiff's decedent incurred losses and damages for personal injury set forth above, loss of use and enjoyment of life, and economic losses, including medical expenses, and the expenditure of time and money.

93.     The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT IV
## NEGLIGENT DESIGN
### (Against All Defendants)

94.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

95.     A Defendant who designs a medical device or instrument, such as surgical staplers, who sells or otherwise distributes a defective device is subject to liability for harm to persons caused by the design defect. A reasonably prudent manufacturer must design its products so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the harm when the product is put to its intended use or to any use that is unintended but is reasonably foreseeable. A medical device is defective if at the time of sale, the device is designed in such a way that it poses harm and risk of injury when used by the intended consumer in the manner the manufacturer has directed and designed.

96.     A reasonably prudent manufacturer of those products would also know that a stapler failing to form a stable anastomosis could cause serious injury because the procedure may need to be converted to an open procedure, and that even where it might cause only serious injury, the injured patient would require multiple hospitalizations, surgeries, and significant medical care to treat.

97.     Decedent Peter Lumaghi was harmed by Defendants' defective surgical staplers, which were distributed, manufactured, and sold by Defendants. Defendants' surgical staplers contained a design defect that made the products unreasonably dangerous to patients. Specifically, there was a design and/or manufacturing defect that would result in a stapler forming staple lines which failed, or failure to deploy staples, despite proper utilization by a surgeon. That design defect in the staplers existed when those products left the manufacturer's control.

98.    As a direct and proximate result of Defendants' design defects, Plaintiff and Plaintiff's decedent incurred losses and damages for personal injury set forth above, loss of use and enjoyment of life, and economic losses, including medical expenses, and the expenditure of time and money.

99.    Furthermore, Defendants' negligence was a cause or contributing cause of decedent Peter Lumaghi's death.

100.    Plaintiff alleges there were safer alternative designs of EEA circular staplers available to Defendants at the time the EEA circular stapler at issue in this case was sold. Those designs were reasonable, and economically and technologically feasible at the time the stapler at issue in this case was sold. Moreover, Plaintiff alleges that sutures are a safer alternative to surgical staplers in procedures such as that performed on Plaintiff's decedent on July 25, 2018. Further evidence of the safer alternative designs will be presented by Plaintiff's expert witnesses.

101.    As a direct and proximate result of Defendants' negligence, Plaintiff and Plaintiff's decedent suffered significant damages, including but not limited to physical injury, economic loss, pain and suffering, and death.

102.    The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT V
## NEGLIGENT MANUFACTURING
### (Against All Defendants)

103.   Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

104.   A Defendant who manufactures a medical device or instrument, such as surgical staplers, who sells or otherwise distributes a defective device is subject to liability for harm to persons caused by the manufacturing defect. A reasonably prudent manufacturer must manufacture its products so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the harm when the product is put to its intended use or to any use that is unintended but is reasonably foreseeable. A medical device is defective if at the time of sale, the device is manufactured in such a way that it poses harm and risk of injury when used by the intended consumer in the manner the manufacturer has directed.

105.   A reasonably prudent manufacturer of those products would also know that a stapler failing to form a stable anastomosis could cause serious injury because the procedure may need to be converted to an open procedure, and that even where it might cause only serious injury, the injured patient would require multiple hospitalizations, surgeries, and significant medical care to treat.

106.   Decedent Peter Lumaghi was harmed by Defendants' defective surgical staplers, which were distributed, manufactured, and sold by Defendants. Defendants' surgical staplers contained a manufacturing defect that made the products unreasonably dangerous to patients. Specifically, there was a manufacturing defect that would result in a stapler forming staple lines which failed, or failure to deploy staples, despite proper utilization by a surgeon. That manufacturing defect in the staplers existed when those products left the manufacturer's control.

35

107.    As a direct and proximate result of Defendants' negligent manufacturing, Plaintiff and Plaintiff's decedent incurred losses and damages for personal injury set forth above, loss of use and enjoyment of life, and economic losses, including medical expenses, and the expenditure of time and money.

108.    Defendants' negligence was a cause or contributing cause of decedent Peter Lumaghi's death.

109.    As a direct and proximate result of Defendants' negligence, Plaintiff and Plaintiff's decedent suffered significant damages, including but not limited to physical injury, economic loss, pain and suffering, and death.

110.    The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT VI
## NEGLIGENT FAILURE TO WARN
### (Against All Defendants)

111.    Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

112.    A Defendant who designs or manufactures a medical device or instrument, such as surgical staplers, who sells or otherwise distributes a device with inadequate warnings is subject to

liability for harm to persons caused by the defective warnings. A reasonably prudent manufacturer must provide warnings with its products so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the harm when the product is put to its intended use or to any use that is unintended but is reasonably foreseeable. A product's warning is defective if at the time of sale, the warning fails to effectively communicate to the consumer or user the dangers that are inherent in the product during the product's normal use, and the dangerous consequences that can or will result from misuse or abnormal use of the product.

113.    The warning must be in a form which could reasonably be expected to catch the attention of, and be understood by, the ordinary user. Thus, a medical device is defective if, at the time of sale, the warnings and instructions provided with the device fail to provide adequate warnings of the dangers inherent in the product's proper use.

114.    A reasonably prudent manufacturer of those products would know that a stapler failing to fire staples could cause serious injury because the procedure may need to be converted to an open procedure, and that even where it might cause only serious injury, the injured patient would require multiple hospitalizations, surgeries, and significant medical care to treat.

115.    Defendants knew that their surgical staplers posed a risk to patients when used as intended because the circular stapler product lines were plagued by defects which could cause anastomotic leaks. Despite knowing this, Defendants failed to adequately warn potential surgeons or patients at the time they discovered, or should have discovered, the defective nature of their circular surgical staplers. Defendants were negligent for not providing sufficient notice or warnings of the risks associated with using the subject surgical staplers, including the risks associated with malfunction. Those inadequate warnings and instructions existed at the time the stapler(s) left the manufacturers' control.

37

116. As a direct and proximate result of Defendants' failure to warn, Plaintiff and Plaintiff's decedent incurred losses and damages for personal injury, loss of use and enjoyment of life, and death.

117. The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

### COUNT VII
### WRONGFUL DEATH
### (Against All Defendants)

118. Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

119. Plaintiff is the surviving spouse of Peter Lumaghi, deceased, and brings this wrongful death action pursuant to § 537.080 RSMo. on behalf of herself and all other legal beneficiaries as defined in § 537.080.1(1) RSMo.

120. As a direct and proximate result of one or more of the aforesaid acts or omissions of the Defendants complained of here and above, Plaintiff suffered the following damages, harms, and losses:

(a)     Peter Lumaghi's loss of life;

(b)     Loss of consortium;

38

(c)      Loss of companionship and society;

(d)      Loss of guidance;

(e)      Loss of services;

(f)      Loss of counsel;

(g)      Peter Lumaghi's injuries, pain and suffering prior to his death; and

(h)      Funeral and medical expenses.

121.    The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT VIII
## SURVIVORSHIP
### (Against All Defendants)

122.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Petition as if fully set forth herein.

123.    Plaintiff submits this survivorship action pursuant to RSMo. § 537.020 in the alternative to Plaintiff's wrongful death cause of action.

124.    Plaintiff Nancy Dowd Lumaghi brings this action as the personal representative of the Estate of Peter Lumaghi.

125.    As a direct and proximate result of one or more of the aforesaid acts or omissions

39

of the Defendants complained of here and above, Peter Lumaghi suffered serious and permanent injuries, including pain and suffering, from the date of the surgery up until the time of death.

126.    Plaintiff Nancy Dowd Lumaghi seeks all damages allowable by law for the injuries sustained to Peter Lumaghi from the surgery up until the time of his death.

127.    The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## PUNITIVE DAMAGES ALLEGATIONS
### (Against All Defendants)

128.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Petition as if fully set forth here.

129.    On March 18, 2019, the FDA sent a "Letter to Health Care Providers" regarding "Safe Use of Surgical Staplers and Staples" ("FDA Letter").[28]

130.    The FDA Letter states that the FDA, between January 1, 2011, and March 31, 2018, received "over 41,000 individual medical device reports for surgical staplers and staples for internal use," which showed 366 deaths, over 9,000 serious injuries, and over 32,000 malfunctions.

131.    The FDA Letter states that some of the "most commonly reported problems in these

---

[28] https://www.fda.gov/medical-devices/letters-health-careproviders/safe-use-surgical-staplers-and-staples-letter-health-care-providers

40

adverse event reports" included "opening of the staple line or malformation of staples," "misapplied staples (e.g., user applying staples to the wrong tissue or applying staples of the wrong size to the tissue)," and "misfiring."

132.    Medical device malfunctions are typically reported on the FDA's MAUDE database. According to the MAUDE website, the database houses medical device reports submitted to the FDA by mandatory reporters (manufacturers, importers, and device user facilities) and voluntary reporters such as health care professionals, patients, and consumers.[29]

133.    Specifically, MAUDE data represents reports of adverse events involving medical devices. An on-line search is available which allows you to search the database's information on medical devices which may have malfunctioned or caused a death or serious injury.  MAUDE data is current through the end of the previous month.

134.    Adverse Incident reports on the MAUDE database are important sources of information for doctors, device manufacturers, and hospitals. These reports allow each of those parties to educate themselves on potential pitfalls associated with devices before using the devices.

135.    On March 8, 2019, Christina Jewett of Kaiser Health News published an article entitled, "Hidden FDA reports Detail Harm Caused by Scores of Medical Devices." The article details how Surgical Stapler manufacturers had quietly been granted "a special 'exemption' allowing them to file reports of malfunctions in a database hidden from doctors and from public view."

136.    According to the Kaiser Health News article by Christina Jewett, "Device maker Medtronic, which owns stapler maker Covidien, has been described as the market leader in surgical staplers. A company spokesman said that the firm has used reporting exemptions to file stapler-

---

[29] https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems

41

related reports through July 2017. Ethicon, the other major stapler maker, said it has not. The public database shows that Medtronic has reported more than 250 deaths related to staplers or staples since 2001."

137.   Defendant's conduct described herein, when viewed objectively from the standpoint of Defendant at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Specifically, as shown above, Defendants intentionally hid malfunctions and surgical staplers from physicians, patients, and hospitals by reporting the vast majority of incidents to a hidden database. This prevented doctors from learning how to better deal with malfunctions and misfires during surgery, and made it appear to Defendants' customers that their staplers were safer than they actually were. Moreover, Defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others. The injuries suffered by Plaintiff and Plaintiff's decedent were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff and Plaintiff's decedent. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Nancy Dowd Lumaghi, Individually and as Personal Representative of the Estate of Peter Lumaghi, Deceased, prays for judgment against Defendants, individually and collectively, jointly, and severally, as follows:

(a)   Trial by jury;

(b)     Judgment against Defendants for all compensatory and punitive damages allowable to Plaintiff, individually, and as Personal Representative of the Estate of Peter Lumaghi;

(c)     Judgment against Defendants for all other relief sought by Plaintiff under this Petition;

(d)     For reasonable attorneys' fees and costs;

(e)     For pre-judgment and post-judgment interest; and

(f)     For such further and other relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts and as to all issues.

Dated:  July 15, 2022


*/s/ Patrick R. Dowd*
Patrick R. Dowd – MO Bar #: 64820
HOLLAND LAW FIRM, LLC
211 N. Broadway, Suite 2625
St. Louis, MO 63102
Tel: 314-241-8111
Fax: 314-241-5554
Email: pdowd@hollandtriallawyers.com

*/s/ Ellen A. Presby*
Ellen A. Presby
FERRER, POIROT, WANSBROUGH
FELLER, DANIEL
2603 Oak Lawn Avenue, Suite 300
Dallas, TX 75219
Tel: 214-521-4412
Email: epresby@lawyerworks.com
*Admitted Pro Hac Vice*

***COUNSEL FOR PLAINTIFF***

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing is being filed using the Court's CM/ECF system this 15th day of July, 2022, which will automatically serve a copy to all known counsel of record via electronic mail.

*/s/ Ellen A. Presby*
Ellen A. Presby